AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

**9/2/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

United States of America

v.

Uriel GONZALEZ SANCHEZ,

Defendant

FILED
CLERK, U.S. DISTRICT COURT

**9/02/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

Case No.  2:25-mj-05416-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 1, 2025 in the county of Los Angeles in the Central District of California, the

defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of unauthorized access devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Ryan Hudson
*Complainant's signature*

Ryan Hudson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____ September 2, 2025 _____

*Judge's signature*

City and state:  Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rahul R.A. Hari (x6159)

## <u>AFFIDAVIT</u>

I, Ryan J. Hudson, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.  This affidavit is made in support of a criminal complaint against, and arrest warrant for, Uriel GONZALEZ SANCHEZ ("GONZALEZ") for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

2.  This affidavit is also made in support of an application for warrants to search the following:

a.  a cellular telephone seized from GONZALEZ during his arrest on September 1, 2025, that is currently in the custody of Homeland Security Investigations ("HSI"), in Santa Ana, CA, (the "SUBJECT DEVICE") and described further in Attachment A-1; and

b.  a white BMW X-5 operated by GONZALEZ before his arrest on September 1, 2025, that is currently parked in the public parking lot located at 11305 S. Crenshaw Boulevard in Inglewood, CA, (the "SUBJECT VEHICLE") and described further in Attachment A-2.

3.  The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B.

Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am Special Agent with the Department of Homeland Security, HSI and have been since December 17, 2023.  I have received approximately 750 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia ("FLETC").  While at FLETC, I completed blocks of instruction and labs that have enabled me to identify potential sources of electronic evidence, including but not limited to computers, cell phones, and other digital storage media and to preserve and exploit such evidence.  Additionally, I have been trained in various investigative disciplines including techniques for investigating money laundering, contraband smuggling, drug smuggling, undercover operations, and multiple types of surveillance.

6.    Before my tenure as a Special Agent, I served approximately three years as a United States Border Patrol

Agent.  As a Border Patrol Agent, I investigated crimes related to U.S. border enforcement.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Between January 2024 and May 2024, the California Department of Social Services ("DSS") detected more than $56.4 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses.  Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

8.    On or about September 1, 2025, at approximately 6:00 a.m., law enforcement conducted physical surveillance at a Wells Fargo Bank located at 11305 S Crenshaw Boulevard in Inglewood, CA (the "Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud.  At approximately 6:10 a.m., law enforcement saw GONZALEZ drive up to the Target Bank in the SUBJECT VEHICLE, exit the car, and approach an ATM terminal at the Target Bank.

9.    Through subsequent investigation, law enforcement determined that GONZALEZ withdrew approximately $1000 in cash from the ATM using an unauthorized access device.  Additionally, law enforcement found two cloned ATM cards on GONZALEZ's person and determined that information on one of the cloned cards matched the EBT information GONZALEZ used to withdraw the cash from the ATM at the Target Bank.

10.  Law enforcement arrested GONZALEZ, found that he was in possession of the SUBJECT DEVICE, and obtained consent from GONZALEZ to search the SUBJECT DEVICE.  During a search of the SUBJECT DEVICE, law enforcement found evidence indicative of GONZALEZ's participation in a conspiracy to engage in bank fraud through the use of unauthorized access devices.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Regulatory Background of CalFresh and CalWORKs Programs**

12.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

13.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

14. CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards"). EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

15. The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN"). A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

16. Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month. Those benefits are deposited directly from DSS into the account of the EBT cardholder.

17. The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

18.    Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

19.    A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

20.    On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic

card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

21. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

22. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

23. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw

cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

24. In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area. This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time. Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

25. As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud. Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits. As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States. All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

26.   In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those GONZALEZs came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional GONZALEZ possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that GONZALEZ had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these GONZALEZs were determined to be citizens Romania, who did not have documentation to be lawfully present in the United States.  The three arrested GONZALEZs were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three GONZALEZs for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. §

1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

27.   In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

28.   Ten out of the eleven of these GONZALEZs were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.    Background of Current Operation to Combat EBT Fraud**

29.   The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and August 2025, more than approximately $56.4 million has been stolen from victim EBT cards throughout California.

30.   Of the more than approximately $56.4 million stolen during this five-month time period, more than approximately $23.1 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

31.  Between on or about July 1, 2024, and on or about July 5, 2024, according to data from DSS, more than approximately $6.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $6.4 million stolen from victim EBT cards in the beginning of July 2024, more than approximately $2.4 million was stolen, almost entirely through unauthorized ATM withdrawals, in Los Angeles County alone.

32.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

33.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that

suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

34.   Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals happen during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

    **D.    GONZALEZ Committed EBT Fraud Using Unauthorized Access Devices on September 1, 2025**

35.   Based on DSS data, I learned that between August 1, 2025, and August 5, 2025, the Target Bank was used to conduct illicit withdrawals from approximately 104 victim cardholders for an approximate financial loss of $69,770.00.  Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement chose the Target Bank for a surveillance operation in September 2025.

36.   On or about September 1, 2025, beginning at approximately 6:00 a.m., law enforcement began surveillance on the Target Bank.  Based upon my training and experience, I know EBT cardholders are not able to conduct cash withdrawals from their EBT cards until approximately 6:00 a.m.

37.  At approximately 6:10 a.m., law enforcement personnel conducting surveillance saw the SUBJECT VEHICLE park near the Target Bank and a man later identified as GONZALEZ exit the SUBJECT VEHICLE and walk up to the Target Bank's ATM terminal. Then, once GONZALEZ reached the ATM terminal, members of the surveillance team watched as GONZALEZ appeared to attempt multiple ATM withdrawals in quick succession.  After standing in front of the ATM for approximately five minutes, GONZALEZ concluded his use of the ATM after making what appeared to be a single successful withdrawal.  I know from my training and experience that individuals engaged in EBT fraud might carry account information for multiple victims and will try each until they are successful in withdrawing from a victim account.

38.  At approximately the same time that members of the surveillance team saw GONZALEZ using the ATM at the Target Bank, law enforcement began receiving live alerts from a California Department of Justice database regarding potential fraudulent use of cloned EBT cards at the Target Bank.  The live alerts included information that there had been a successful withdrawal from an EBT cardholder account for $1,000 at or around the time GONZALEZ appeared to make a withdrawal.

39.  Based on the date, time, ATM location, California Department of Justice live alerts, and the successful ATM withdrawal from an EBT cardholder account during a short time period, law enforcement decided to investigate GONZALEZ further and detained him as he walked away from the ATM and toward the SUBJECT VEHICLE.

40.    During that detention, law enforcement determined that GONZALEZ had in his pants pockets: 1) the SUBJECT DEVICE, 2) $1,000 in cash, and 3) two cloned cards.  The first cloned card appeared on its face to be a Bass Pro Shop Gift Card with black plastic and a magnetic stripe.  The second cloned card appeared on its face to be a Guitar Center Gift Card with red plastic and a magnetic stripe.  Each card had stickers placed on the back with what appeared to be, based on my training and experience, card balances and the victims' PINs:



41.    I analyzed the magnetic stripes of the cloned cards and determined that both of them were encoded with card numbers that do not match the card numbers on the gift cards.  I learned from my review that the accounts cloned onto the cards corresponded to the PINs on the attached stickers and that the balances on each account closely, but not precisely, matched the balances on the stickers.  Based on my review of EBT cardholder information obtained from DSS, none of the EBT cards transacted by GONZALEZ belonged to him.

42.   After law enforcement seized the SUBJECT DEVICE, a Spanish speaking agent asked GONZALEZ for consent to search the SUBJECT DEVICE and GONZALEZ provided that consent.  Then, that Spanish speaking agent reviewed some of the photographs and text message conversations on the SUBJECT DEVICE.  According to that agent, the evidence he reviewed included (in substance and summary) the following:

        a.   Photographs of three stacks of rubber-banded plastic cards with magnetic stripes and colored sticker dots, similar to the cards found on GONZALEZ's person;

        b.   WhatsApp messages that appear to have been sent from the SUBJECT DEVICE implying that a laptop had been used to encode plastic cards with EBT account information, and that the user had met with co-conspirators the night before in Irvine, California.  The message stream included a photograph of a grey laptop in black backpack; and

        c.   WhatsApp messages that appear to have been sent to and received by the SUBJECT DEVICE in which the user and suspected co-conspirators are discussing how many EBT cards will be ready in time for use.  Several messages in the stream appear to have been deleted.  The SUBJECT DEVICE continued receiving messages in the conversation until 8:30 a.m. on September 1, 2025.

**V.   TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

43.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.    It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers,

passport numbers, and employer or taxpayer identification numbers. Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units. Software relevant to such schemes can also often be found on digital devices, such as computers.

e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.     Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

44.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICE as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

45. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

     a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    46.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>CONCLUSION</u>

    47.  For all of the reasons described above, there is
probable cause to believe that GONZALEZ has committed a
violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access
devices).

    48.  There is also probable cause that the items to be
seized described in Attachment B will be found in a search of

the SUBJECT DEVICE and Vehicle as described in Attachments A-1

and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
September, 2025.

THE HONORABLE PEDRO V.CASTILLO
UNITED STATES MAGISTRATE JUDGE